No. 24-1815

========================================

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

PATRICK J. MADIGAN

*Petitioner,*

v.

DEPARTMENT OF THE NAVY,

*Respondent.*

## PETITION FOR REVIEW OF THE FINAL OPINION AND ORDER BY THE MERIT SYSTEMS PROTECTION BOARD IN DOCKET NO. SF-0752-22-0069-I-1

## REPLY BRIEF OF PETITIONER PATRICK J. MADIGAN

Benjamin D. Johnson
Pierce Jewett, PLLC
1111 East Main Street, Suite P120
Richmond, Virginia 23219
Tel: 804-413-4021
Fax: 757-257-0387
bjohnson@piercejewett.com

*Counsel for Petitioner*

# **TABLE OF CONTENTS**

Introduction ..................................................................................................1

Argument .....................................................................................................3

   I.  The Court Should Reverse the MSPB's Decision that Madigan Failed to

      Follow Proper Instructions Because that Decision is Not Supported By

      Substantial Evidence ...............................................................................3

        a.  Instruction 2075 ............................................................................3

        b.  Cybersecurity Training .................................................................11

        c.  JER ..............................................................................................13

        d.  SOU ............................................................................................14

   II.  The MSPB's Conclusion that there was a Nexus Between Madigan's

      Alleged Conduct and the Efficiency of the Service is Not Supported by

      Substantial Evidence ...............................................................................18

   III.  The Penalty of Termination is Not Supported by Substantial Evidence and

      Should be Reversed ................................................................................20

Conclusion ...................................................................................................23

# TABLE OF CASES AND AUTHORITIES

## Cases

*Smith v. General Services Administration*, 930 F.3d 1359 (Fed. Cir. 2019) .............
.................................................................................2, 6, 10, 16, 20

*Jenkins v. Merit Sys. Prot. Bd.*, 911 F.3d 1370, 1373 (Fed. Cir. 2019) ....................1

*Rodriguez v. Dep't of Homeland Sec.*, 2011 M.S.P.B. 103, P8 (2011) ...............1,11

*Sanders v. Department of the Interior*, No. SF-0752-20-0142-I-1, 2020 WL
4439215 ..............................................................................2,6, 8,11,15

*SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006)
...........................................................................................9

*Brown v. Department of Treasury*, 152 Fed. App'x 919 (Fed. Cir. 2005) .............15

*Boyd v. Dep't of Veterans Affs.*, 740 F. App'x 710, 713 (Fed. Cir. 2018).............16

*Bigelow v. Dep't of Health & Human Servs.*, 750 F.2d 962, 966 (Fed. Cir. 1984) 16

*Powell v. U.S. Postal Service*, 122 M.S.P.R. 60, 65 (2014) .......................18, 19, 20

*Blevins v. Dep't of the Army*, 26 M.S.P.R. 101, 104 (1985), *aff'd*, 790 F.2d 95
(Fed. Cir. 1986) ...............................................................................19

*Douglas v. Veterans Admin.*, 5 M.S.P.B. 313, 330 (1981)...............................21, 22

*DeWitt v. Dep't of Navy,* 747 F.2d 1442, 1445 (Fed. Cir. 1984) ...........................21

## Other Authorities

*Hamilton v. U.S. Postal Service*, 71 M.S.P. 547, 555—56 (1996) .........................2

*Ellis v. Department of Defense*, 114 M.S.P.R. 1407, ¶ 11 .....................................18

## <u>INTRODUCTION</u>

The essence of the Agency's argument in this case to date can be summed up as: "Madigan should have known better." In its briefing, the Agency attempts to direct the Court's attention towards the nature of Madigan's conduct rather than the core inquiry at hand: whether that conduct violated instructions that were properly issued under applicable law. And while the Agency is correct that Madigan "bears the burden of establishing error in the MSPB's decision," *Jenkins v. Merit Sys. Prot. Bd.*, 911 F.3d 1370, 1373 (Fed. Cir. 2019), it fundamentally ignores (or misunderstands) that the Agency must prove the necessary elements of its charge in order to withstand Madigan's challenge on appeal. *See Pope v. United States Postal Serv.*, 114 F.3d 1144, 1147 (Fed. Cir. 1997) ("[A]n agency must establish three things to withstand challenge to an adverse action against an employee….[1] that the charged conduct occurred…[2] a nexus between that conduct and the efficiency of the service…and [3] that the penalty imposed is reasonable.") (citations omitted).

Here, the Agency chose to remove Madigan on the charge of failure to follow instructions. The Court's task is therefore to determine whether the record contains "substantial evidence" to support that specific charge, rather than evaluate whether the record contains evidence of conduct that would ordinarily justify removal in the abstract, as the Agency appears to ask the Court to do here. *See* 5 U.S.C. § 7703(c); *see also Rodriguez v. Dep't of Homeland Sec.*, 2011 M.S.P.B. 103, P8 (2011) ("The

Board will not sustain an agency action on the basis of charges that could have been brought but were not.").

The Agency was required to satisfy specific elements in order to prove its charge. Specifically, it was required to establish that proper instructions were communicated to Madigan and that Madigan violated those properly issued instructions. *See Smith v. General Services Administration*, 930 F.3d 1359, 1368 (Fed. Cir. 2019) ("Proof of a failure to follow instructions charge requires the agency to show that an employee failed to follow a proper instruction[.]") (citing Hamilton v. U.S. Postal Serv., 71 M.S.P.R. 547, 556 (1996)); *see also Sanders v. Department of the Interior*, No. SF-0752-20-0142-I-1, 2020 WL 4439215, at *10 (July 30, 2020) (finding that to prove a failure to follow instructions charge, the agency must show that "specific, proper, procedures or instructions were made known to the appellant and that he failed to follow them") (citing *Hamilton v*, 71 M.S.P.R. at 555—56).

The Agency has not satisfied this burden. Rather, it has attempted to reframe the Court's inquiry to "whether Mr. Madigan received *relevant* instructions," as opposed to specific, proper instructions prohibiting the conduct alleged. *See* Respondent's Br., p.2. In short, the Agency argues that Madigan's conduct violates various general principles set forth or reflected in certain Agency documents, and that Madigan, by virtue of his position, should have gleaned from those general principles that he was not permitted to engage in certain conduct. This

2

"commonsense" argument, however, is untethered from the applicable legal standard, which the Agency has not met. The Court should reverse and set aside the MSPB's decision.

## ARGUMENT

As set forth in Madigan's Opening Brief, the specifications cited by the Agency fall into two general categories: (1) those concerning instances in which Madigan is alleged to have possessed or used his PED inside the facility where he worked (Nos. 1–17); and (2) those that concern instances where Madigan was alleged to have stored inappropriate texts or images on his PED (Nos. 18–55). Respondent further bifurcates the latter category into specifications concerning messages alleged to be "inappropriate" (Nos. 18–23) and photographs that were sexual in nature (Nos. 24–55). *See* Respondent's Br., p. 7. Ultimately, this distinction is irrelevant because, as discussed *infra*, the instructions relied upon by the Agency were either not properly issued or communicated, or, if they were, do not cover the conduct alleged.

I. **The Court Should Reverse the MSPB's Decision that Madigan Failed to Follow Proper Instructions Because that Decision is Not Supported By Substantial Evidence**

a. *Instruction 2075.*

With respect to specifications 1–17, the Agency relies heavily upon Instruction 2075, which the record conclusively establishes was not provided to

Madigan until after the alleged conduct occurred, and which Madigan was not able to access in any event. The record is devoid of evidence that Instruction 2075 was issued or even communicated in the manner required by the plain text of the Instruction itself. In fact, the Agency actively admits that it failed to give Madigan the instruction. Indeed, CO Taddiken testified that he never notified Madigan or others in his command about this instruction despite specific directives in Instruction 2075 about how it was to be disseminated and enforced. *See* Appx0839, line 7—Appx0844, line 7; *see also* Appx0714. Rather, he merely "assume[d] that everybody was aware" of the Instruction and left it at that (Appx0839, line 20—Appx0840, line 6). What is more, the ISSM responsible for "implementing policy and procedures" with respect to this instruction stated that she "had not had a chance to read through" it (Appx0475), while the CSM responsible for a variety of "implementation" and "enforcement" roles stated in the Instruction stated, in writing, that he was not aware of any applicable policy concerning PED use when he witnessed Madigan with his PED in the facility on February 24, 2021 (Appx0273).

Most critically, the Agency cannot overcome Madigan's unrefuted testimony that he *could not have accessed* Instruction 2075 before his PED was confiscated because the link to the instruction provided by the Agency was not functional. *See* Appx0922, line 20—Appx0933, line 10. To be sure, the Agency has not even

attempted to challenge Madigan's unequivocal testimony on this in any of its briefing throughout this litigation, including the briefing before this Court.

At best, in an attempt to overcome this conclusive record evidence, the Agency relies upon the unpersuasive testimony of Lieutenant Commander Sanders that Instruction 2075 is "referred to . . . when you are issued your Government-issued cell phone." *See* Appx014; *see also* Appx0888. But the Agency has not, and cannot, identify which documents it claims "referred to" this Instruction. Certainly, the Agency can point to no record evidence that there were other documents that Madigan was aware of that referred to or incorporated this Instruction, other than the Instruction itself, which contains specific notice requirements that the Agency concedes were not followed. And even if there were documents that "referred to" the Instruction, it would not change the fact that Madigan could not access the Instruction due a dysfunctional link. Sanders testimony that Madigan "might" have been referred to Instruction 2075 via other documents is wholly insufficient to overcome this record evidence.

The Agency also attempts to obfuscate the question of whether Madigan actually received Instruction 2075 by arguing that he "would be familiar with the instructions governing PED use" because he was the head of the department overseeing IT, and because "[o]ther individuals" (including Supervisor Engineer John) either "confronted" him about PED use or "reminded" him about PED use.

*See* Respondent's Br., p. 14. Even a cursory examination of the evidence cited by the Agency reveals that none of these "reminders," of Madigan's alleged constitute validly issued instructions under applicable law. *See Smith*, 930 F.3d at 1368–69 ("[T]he Board failed to discuss the propriety of Mr. Augustus's instruction…The agency introduced no formal policy forbidding weekend work[.]"); *see also Sanders*, 2020 WL 4439215, at *12 ("To reiterate, to prove failure to follow instructions, the agency must first prove that specific, proper, procedures or instructions were given to the appellant.") (citing *Hamilton v*, 71 M.S.P.R. at 555—56). And the generic testimony about Madigan being "familiar with the instructions regarding PED use" is far from sufficient to establish that he was specifically familiar with Instruction 2075, even notwithstanding the plethora of record evidence that the Instruction was not properly issued according to its terms and the fact that Madigan was not able to access it in the first place.

Next, the Agency attempts to persuade the Court that "the signs posted at the entrance of building 464 clearly prohibited PED use in the facility." *See* Respondent's Br., p. 14. Here again, the Agency's argument lacks both context and support in the record. It is true that Madigan posted a sign that reads "CELLULAR PHONES ARE PROHIBITED IN THIS FACILITY." *See* Appx0601. But Madigan did not post this sign as part of an official Agency instruction or directive barring the use of PEDs. Far from it, Madigan's *unrefuted* testimony that he instructed the

posting of this sign in response to a security assessment whereby he attempted to restrict the use of *personal cell phones* inside his facility. *See* Appx0929, lines 9–23.

What is more, both Madigan's testimony and other record evidence shows that the Agency *allowed* personnel to bring their PEDs into the facility in question, contrary to the alleged prohibition on Madigan's sign. *See* Appx0930, lines 16—25; Petitioner's Br., p. 37 (citing testimony from Lee, Schmeiser, Madigan, and Evans about the regularity of PED use). Awkwardly attempting to explain this discrepancy, the Agency cites to cherry-picked testimony from its own witnesses that personnel were *only* allowed to bring their PEDs into the "non-secure quarterdeck area", or into spaces that were not considered "classified spaces," *see* Respondent's Br., p. 18. Even if this was true, however, it would not establish that Madigan was given an "instruction" about how PEDs should and should not be used in his facility. At most, this evidence shows that there some common practices within Madigan's facility about which he may or may not have been aware.

Moreover, the Agency relies heavily upon the red "WARNING" sign from the record, which also purports to prohibit cellphones. *See* Respondent's Br., p. 15[1]. As noted in Petitioner's Opening Brief, however, Madigan did not direct the posting of this sign. Rather, it was posted by another Agency official and was done so *weeks after the Agency had confiscated Madigan's PED*. *See* Petitioner's Br., p. 5 (citing

---

[1] Respondent cites this sign as appearing at Appx0602 but it is actually located at Appx0600.

Appx0929, line 24—Appx0930, line 15 (Madigan's testimony that the larger sign was placed on the facility approximately 1-2 weeks after the Agency confiscated his PED); Appx0799, lines 8—13 (testimony by Madigan's supervisor stating that he does not know whether Madigan posted the larger sign on the facility); and Appx0847, lines 5—15 (testimony by deciding official that he would have no basis to dispute testimony by Madigan that he only placed the smaller sign on the facility)). This sign therefore could not be an instruction that Madigan violated. *See Sanders*, 2020 WL 4439215, at *12 ("An agency cannot prove a charge of failure to follow instructions based on actions occurring before it issued the instructions.").

In response, the Agency attempts to stretch the hearing transcript by citing testimony from Director Schmeiser that this sign had been posted since 2015. *See* Petitioner's Br., p. 16. The actual hearing testimony on this point, however, located at Appx0798—Appx0799, makes clear that Schmeiser was only aware *a sign* had been posted since 2015—i.e., the sign that Madigan originally posted about personal cellphones—rather than the "Warning" sign in question.

Indeed, when confronted with the PED sign in question, Schmeiser stated, "I don't know when it was posted." He then expresses vaguely that a sign had "always been there" since his "time in the building in 2015." Appx0030—Appx0031. But, when pressed for more detail, Schmeiser admitted that he was relying on Madigan's statements about the sign—i.e. Madigan's statement that he posted the original

sign—to conclude that this "Warning" sign was one that Madigan had posted. *See* Appx0031 ("At the time, I did not know [who posted the sign] . . . but . . . now that I know . . . Madigan's oral response to the deciding official . . . I've learned that it was Madigan that directed that those signs be posted.").

Of course, Madigan testimony on this topic is clear and unequivocal: he did post the shorter, non-descript sign on the facility (located at Appx0601), but the second "Warning" sign (located at Appx0600) was not posted until a supplemental security assessment conducted a week or two after his phone was confiscated. Appx0929—Appx0930. The AJ did not even attempt to grapple with these issues from the hearing transcript, and rather accepted, at face value, the patently mistaken proposition that Madigan had posted both signs.

Finally, The Agency argues that Madigan has "waived" this argument because he explains the nature of his testimony in a footnote. *See* Respondent's Br., p. 16. To borrow a phrase from Respondent, that is not so. The body of Petitioner's Opening Brief directly raises the argument that Madigan directed the posting of the sign found at Appx0601. *See* Petitioner's Br., p. 4–5. The footnote attached to this argument adds additional context to Madigan's actions; it is not an isolated argument raised exclusively in a footnote, which is what Respondent's authority is referring to. *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir.

2006) ("This footnote is the only statement that even approaches a substantive argument on novelty in the entire Argument section of SmithKline's opening brief.").

More importantly, even if the Court credits Schmeiser's testimony, there are two critical flaws with the Agency's argument that one or both of these signs constituted "instructions" that Madigan violated. First, as discussed above, that argument ignores the unrefuted testimony, from several individuals, that PEDs were permitted inside the facility under certain circumstances. *See* Petitioner's Br., p. 37 (citing record evidence). The Agency's argument that the plain text of the signs prohibited *all* cellular phones therefore ignores record evidence about the manner in which PEDs were actually used at the facility. And even if the MSPB credited Schmeiser's testimony that the sign posted at Appx0600 had been posted since 2015, the Board's legal conclusion that such sign constituted a validly issued instruction, which this Court must review *de novo*, constitutes reversable error because the record shows that this instruction was, at best, inconsistently applied. *See Smith*, 930 F.3d at 1368–69 (finding that the Agency's instruction improper largely because the Agency "had no rationale for imposing this ban on Mr. Smith alone.").

Second, and most importantly, the Agency has never contended that either of the signs at the CUS facility were "instructions" upon which it based its failure-to-follow-instructions charge. The Agency's argument that Madigan relies upon an "unreasonably narrow" definition of "instruction" misses the point, which is not that

the signs could not, in theory, constitute valid instructions, but that the Agency never identified them as such in its notice of proposed removal. Thus, the Agency's argument that it has "consistently alleged that Mr. Madigan failed to follow instructions provided to him from a variety of sources" falls flat because it ignores the actual charge levied against him. *See Rodriguez*, 2011 M.S.P.B. 103, P8 ("The Board will not sustain an agency action on the basis of charges that could have been brought but were not."). The "signs" referenced by the Agency at this stage were entirely absent from its initial charge and, as CO Taddiken testified, were not relied upon as independent instructions, but were merely "representative" of Instruction 2075. *See* Appx0847, line 20 — Appx0848, line 5. As the record reflects, Instruction 2075 itself was not properly issued pursuant to its own requirements and Madigan was not able to access the Instruction in any event, meaning it cannot form the basis for the Agency's failure-to-follow-instructions charge. *See Sanders*, 2020 WL 4439215, at *12 ("An agency cannot prove a charge of failure to follow instructions based on actions occurring before it issued the instructions.").

      b.    *Cybersecurity Training.*

In a related vein, the original charge filed the Agency says nothing whatsoever about the "cyber security training" upon which it now relies. Indeed, the Agency concedes that this training "does not specifically address the issue of PEDs in secure spaces." *See* Respondent's Br., p. 21. The record makes this abundantly clear in any

event. *See* Appx0602—Appx0618, Appx0925—Appx0926, Appx0801—Appx0802 (Schmeiser testifying that there is "nothing about [Cybersecurity Training] that specifically references whether employees are allowed to bring cell phones or Peds into their facilities"). It is therefore unclear what value the Agency attempts to glean from the argument that this training "put Mr. Madigan on notice of the importance of cybersecurity." *See* Respondent's Br., p. 21. Nothing in the Agency's initial charge claimed that Madigan should be removed because he should have been on notice on the importance of cyber security as a general principle. *See* Appx0076—Appx0092. Here again, the Agency throws evidence at the wall to see what sticks, asking the Court to conclude that Madigan should have known that he could not bring his PED inside the facility because he led the IT department and because he attended cyber security training even though that training said nothing whatsoever about PED use in the facility. *See id.*

The Agency also grasps at straws in Madigan's testimony to show that he must have been aware of some general prohibition on PEDs because he testified that he "always moved [the PED] to a lock box[.]". *See id.* Neither these materials nor this testimony establishes that there was a properly issued instruction given to Madigan. *See* Appx0920 (testimony from Madigan that he had never, since receiving his PED, been given any specific instructions from his superiors about whether he could bring his PED into his facility). Perhaps recognizing this, the Agency claims

that there was a "progression" in Madigan's explanations for when and why he brought his PED into the facility and that these explanations, for some reason, demonstrate that the Agency had issued a proper instruction. *See* Respondent's Br., p. 22. This argument puts the cart before the horse and misstates the applicable burden of proof, which is on the Agency to show that not only did Madigan violate an instruction, but that the instruction was properly issued in the first place, which the Agency cannot do.

    c. *JER.*

Consistent with its approach to the first set of specifications, the Agency's arguments concerning specifications 18–55 attempt to redirect the Court's focus to the nature of Madigan's conduct rather than the question of whether that conduct violated proper instructions. Again, the essence of the Agency's argument is that Madigan deserved to be removed from his position due to the egregiousness of his conduct, notwithstanding the substantial mitigating factors in Madigan's favor and the fact that the Agency chose to specifically charge him with failure-to-follow-instructions, necessitating proof of a validly issued instruction in the first place.

In its brief, the Agency essentially abandons the JER as a basis for its charge, arguing instead that it functions "in tandem" with the statement of understanding (discussed *infra*). *See* Respondent's Br., p. 24. This the Agency must do, because the record is clear that the JER says nothing at all about PED use inside a secure

facility. *See* Appx0379–Appx0386; Appx0851, line 21—Appx0852, line 3. Moreover, the Agency cannot overcome: (i) Madigan's unrefuted testimony that he had never been provided with the JER prior to the confiscation of his PED, *see* Appx0934, lines 5—11; (ii) CO Taddiken's testimony that the version of JER produced in this case may not be the latest version, and the JER may have been updated several times since its publication over three decades ago, Appx0848, lines 16—22; or (iii) the fact Madigan was first notified of the "content" of the JER roughly five months after his device was confiscated, Appx0813, lines 7—12; *see also* Appx0815, lines 14—19.

> d. *SOU.*

Like the JER, the SOU relied upon by the Agency does not address whether PEDs were permitted inside the facility at which Madigan worked. *See* Appx0851, line 21—Appx0852, line 3. Rather, the portion of the SOU relied upon by the Agency concerns whether the PED was used for "official business"—a term that the SOU does not bother to define. *See* Appx0387. There are two principal errors in the Agency's reliance upon this document as an "instruction" that Madigan violated.

First, as noted in Madigan's Opening Brief, the SOU is not an official government instruction of any kind. In contrast with, for example, the JER, there are no official markings or indications on this document suggesting that it establishes a rule or policy of the Agency. *See* Appx0387. And though the Agency attempts to

dismiss the fact that this document was provided to Madigan by a subordinate, that evidence further underscores that the SOU was not a "supervisory instruction" sufficient to support the Agency's removal action. *See Hamilton v. United States Postal Serv.*, 71 M.S.P.R. 547, 555–56 (ruling that a charge of "failure to follow *supervisory* instructions" requires proof that "proper instructions were given to an employee and that the employee failed to follow them[.]") (emphasis supplied).

In response, The Agency argues that an instruction need not be a "formal" policy and may instead take the form of an "informal verbal command." *See* Respondent's Br., p. 26. This argument ignores another fatal defect with the SOU, which is that its lack of specificity or detail concerning the phrases "official business" or "unofficial use" render it vague and ambiguous such that it cannot form the basis for the Agency's charge. *See Sanders*, 2020 WL 4439215, at *12 ("To reiterate, to prove failure to follow instructions, the agency must first prove that specific, proper, procedures or instructions were given to the appellant.") (citing *Hamilton v*, 71 M.S.P.R. at 555—56).

The Agency, for example, relies upon the case of *Brown v. Dep't of Treasury*, 152 F. App'x 919, 922 (Fed. Cir. 2005) for the proposition that a verbal instruction may be sufficient to support a failure-to-follow-instructions charge. *See id.* But in that case the instruction consisted of an unequivocal, clear instruction "not to call [the Treasury Inspector General for Tax Administration office] any more." *See*

*Brown*, 152 F. App'x at 922. There is no such clarity here. The Agency officials who testified about the SOU could not make heads or tails of what it means by "official business," further illustrating that the document does not set forth a clear, specific directive as required by applicable law. *See* Petitioner's Br., pp. 17; 31–32. Indeed, CO Taddiken admitted that certain non-official uses of the PED were permitted but could not establish any relevant parameters of these uses (*see* Appx0850, line 20—Appx0851, line 3), thus failing to satisfy the Agency's burden that the SOU sets forth a clear, specific instruction.

The remaining authority relied upon the Agency further illustrates the serious defects with the SOU. In *Boyd v. Dep't of Veterans Affs.*, the instruction at issue was a "Stay Away Notification" that stated "[e]ffective immediately, and until further notice, you are instructed to have absolutely no contact or (written/verbal) communication with Matthew Jahn, DAV Representative." 740 F. App'x 710, 711. There is no ambiguity whatsoever in this directive. The same is true of the directive in *Bigelow v. Dep't of Health & Human Servs.*, which consisted of an order that the petitioners must "participate in a refresher training program so they could resume their agency work when not engaged in union activities." *See* 750 F.2d at 963. Neither of these examples leave room for interpretation or confusion, in marked contrast to the SOU.

Contrary to the Agency's argument otherwise, the SOU is much more akin to the instruction at issue in *Smith v. Gen. Servs. Admin.*, where the Court found that the Board's decision to sustain a specification "lacks substantial eviden[tiary] support" largely due to its lack of clarity and inconsistent application. *See* 930 F.3d 1359, 1368 (Fed. Cir. 2019). The Agency's argument that the question is whether the instruction "aligns with policy" misses the mark because it presupposes that the instruction is not vague and ambiguous to begin with. Moreover, the Agency's argument that Madigan "could have asked his supervisor" for clarity misstates the applicable burden of proof, which falls on the Agency to establish a valid, clear instruction in the first place, not on Madigan to rehabilitate a one-page, informal directive that fails to define its own terms.

Finally, and perhaps most fatal to the Agency's contention here, is the fact that the Agency could not satisfy its burden to prove that Madigan actively stored any of the images in question on his device. Rather, the record reflects that the images may have been sent to him by others or synced from his iCloud account, which Madigan was encouraged by the Agency to connect to his PED. *See* Appx0937, line 1—Appx0938, line 19. The Agency glosses over this argument dismissively in a footnote, arguing that the memes "were either sent to or received from college friends using his Government-issued PED." Petitioner's Br., p.32. But the Agency admitted at the hearing that memes sent to Madigan by others was

something he "can't really control." *See* Appx0937, lines 9—23. At best, the Agency seems to suggest that Madigan was obligated to preemptively block inappropriate messages from colleagues and actively delete images synced from his iCloud account. But this precisely illustrates the problem with the ambiguity of the SOU. Indeed, even if the "official use" instruction from the SOU was clear enough to be considered a valid instruction—which it was not—the instruction certainly would not have been clear enough put Madigan (or anyone) on notice that he needed to take proactive action to prevent images from syncing to his device or to instruct others not to send images to his device. For these reasons the Court should find that the Agency has failed to satisfy its burden to establish that Madigan violated a valid instruction.

## II. The MSPB's Conclusion that there was a Nexus Between Madigan's Alleged Conduct and the Efficiency of the Service is not Supported by Substantial Evidence

As set forth in Petitioner's Brief, neither the Initial Decision nor the Final Decision of the Board offer any substantive analysis regarding whether there is "a clear and direct relationship between the articulated grounds for the adverse action and either the appellant's ability to accomplish his duties satisfactorily or some other legitimate government interest." *See Powell v. U.S. Postal Service*, 122 M.S.P.R. 60, 65 (2014) (citing *Ellis v. Department of Defense*, 114 M.S.P.R. 1407, ¶ 11). That is likely because there is insufficient record evidence to support the Board's

unsupported conclusion. The Initial Decision summarily concluded that Madigan's "decision to use a cellular device to text and call others from classified spaces had potential to cause harm to the nation" based on an unspecific reference to the testimony of CO Taddiken, which itself cited no facts in support. Appx0034. Moreover, the Final Order's conclusory allegation that a "charge of failure to follow instructions relates directly to the efficiency of an employee's service" is essentially a regurgitation of the applicable standard and provides no coherent analysis of why Madigan's alleged conduct affected his ability to "accomplish his duties satisfactorily or some other legitimate government interest." *See* Appx0048.

The Agency retorts that "[f]ailure to follow instructions or abide by requirements affects the agency's ability to carry out its mission" in an attempt to persuade the Court that *any* failure to follow an instruction necessarily bears a nexus to an employee's duties or a legitimate government interest. *See Blevins v. Dep't of the Army*, 26 M.S.P.R. 101, 104 (1985), *aff'd*, 790 F.2d 95 (Fed. Cir. 1986). That is not the case. The nexus requirement is separate element that the Agency must prove independently of whether it establishes that an employee violated a validly issued instruction. *See Powell v. U.S. Postal Service*, 122 M.S.P.R. 60, 63–65 (2014). And in this case the record demonstrates that Madigan did not use his PED in a SCIF, a T-SCIF, a TSWA, or in any way that posed any sort of security threat. *See* Appx0924, line 5—Appx0925, line 13. Indeed, CO Taddiken testified that he had

no knowledge of any confidential information being transmitted, any loss or destruction of any Agency date or information, or any form of identifiable harm that would be sufficient to give rise to a direct relationship to a government interest or Madigan's duties. *See* Appx0856, line 12—Appx0857, line 4.

The Agency also attempts to have it both ways by arguing that either (1) Madigan knew of the instructions at issue and therefore understood that his actions raised security concerns or that (2) if Madigan did not know, it supports the Agency's conclusion that CO Taddiken "had lost trust" in him because Madigan should have known about "the policies involving PED use" by virtue of his position as the department head of N6. *See* Respondent's Br., p. 36. This catch-22 falls apart upon closer scrutiny. The reality, as reflected by the record, and as discussed *supra*, is that the Agency was responsible for issuing the instructions it claims Madigan violated but failed to do so. The argument that Madigan should have known about "the policies involving PED use" notwithstanding the Agency's failure to properly promulgate the instructions upon which it now relies further illustrates that the Agency attempts to rely upon general principles rather than specific, clear directives, as it is required to do under applicable law. Moreover, the Agency did not establish a "clear and direct relationship" between Madigan's conduct and the efficiency of the service, *see Powell*, 122 M.S.P.R. at 65, and the MSPB's finding as to nexus

should be reversed because it is not supported by substantial evidence. *See Smith*, 930 F.3d at 1364.

### III.    The Penalty of Termination is Not Supported by Substantial Evidence and Should be Reversed

Lastly, the Agency's determination that Madigan should be terminated is "out of proportion to the character of the offense" and should be reversed. *See Douglas v. Veterans Admin.*, 5 M.S.P.B. 313, 330 (1981) (internal quotation omitted). While the Agency is correct that its choice of penalty is afforded some degree of deference, the severe penalty of termination is "unwarranted in light of the relevant factors" and should be reversed under the applicable standard. *See DeWitt v. Dep't of Navy*, 747 F.2d 1442, 1445 (Fed. Cir. 1984). That is especially true given the paltry analysis performed by the Board in both the Initial Decision and Final Decision, neither of which did much more than summarily conclude that the deciding official evaluated the relevant factors. *See* Appx0034—Appx0038; Appx0048.

As noted in Petitioner's Opening Brief, the Initial Decision's conclusion as to the *Douglas* factors lacks substantial evidentiary support largely because it purports to cite facts that are not even in the record, including the nonexistent "fact" that it was Madigan's "duty to know, enforce, and understand the rules and regulations related to PEDs," which it clearly was not. *See* Petitioner's Br., p. 49. The Agency retorts that this conclusion is supported by the record because Madigan was the head of N6 and instructed his subordinates to post a sign advising personnel of the

prohibition on cellular phones. *See* Respondent's Br., p. 40. Notwithstanding the fact that the sign at issue concerned *personal* cell phones, this broad conclusion ignores the fact that the "PED" instructions the Board refers is in fact Instruction 2075, which places the obligation of its promulgation on Agency officials other than Madigan, *see* Appx0710—Appx0730, each of whom failed to comply with those promulgation requirements. *See* Appx0839, line 7—Appx0844, line 7; Appx0475; Appx0841, lines 17—18; Appx0273. There is no evidence that Madigan was responsible for knowing or enforcing any particular instructions and this vague conclusion exposes the Agency's repeated attempt to glean a general principle of "Madigan was in charge so he should have known better" despite record evidence demonstrating that he did not violate any specific instruction that the Agency validly issued.

More glaring, however, is the Agency's failure to consider Madigan's spotless performance history, consisting of 29 years of discipline-free, exemplary service, where he received numerous awards and commendations. *See* Appx0910, line 6—Appx0915, line 12; *see also* Appx0661. The Initial Decision merely mentions Madigan's "years of Federal service," yet says nothing about the fact that he had received no discipline whatsoever during this nearly three-decades long time-period. *See* Appx0916, lines 6—9; *see also* Appx0864, line 24—Appx0865, line 2. This critical omission is fatal to the Board's analysis given the importance of this particular *Douglas* factor. *See Douglas*, 5 M.S.P.B. at 330 ("finding that

proportionality is "particularly true of an employee who has a previous record of completely satisfactory service") (internal quotation omitted). It is also crucially important that Madigan's conduct was neither intentional nor caused harm to the Agency and the Agency's dismissiveness of these exculpatory facts illustrates the facile and perfunctory nature of the MSPB's underlying analysis.

Thus, the Agency is mistaken that it "did conscientiously consider the relevant [*Douglas*] factors," as it is apparent that the decision maker reached a foregone conclusion without evaluating the highly unique circumstances of this particular case, which included a highly accomplished employee of nearly three decades with no disciplinary history to speak of who engaged in conduct that, while certainly questionable, did not run afoul of established Agency instructions, despite the Agency's best post-hoc efforts to string together a specific rule from the various general materials it cites.

## CONCLUSION

The Agency chose to charge Madigan with failure-to-follow instructions and has failed to satisfy its burden of proof as to that charge. Madigan's conduct was undoubtedly embarrassing but the question before the Court is not whether Madigan's conduct is unbecoming or ideal, but rather whether it violated specific, proper instructions. The record shows that it did not and the Court should reverse the Board's finding as to Madigan's alleged violation as a result. The record further

shows that there is insufficient evidence in the record to support the Board's nexus and penalty determinations, each of which independently warrants reversal. Madigan strongly urges this Court to reverse the MSPB's decision and award all relief available to him by law, including but not limited to: reinstatement, backpay, and attorneys' fees.

Respectfully Submitted,

/s/ Ben D. Johnson
Benjamin Johnson
*Counsel for Appellant*

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was served by email and the Court's CMF system on December 16, 2024 on the following counsel of record for the Agency:

Patrick Angulo
United States Department of Justice
Commercial Litigation Branch
PO Box 480 Ben Franklin Station
Washington DC 20044
Tel: 202-507-6083
Patrick.s.angulo@usdoj.gov

/s/ Ben D. Johnson
Benjamin Johnson
*Counsel for Petitioner*

**CERTIFICATE OF COMPLIANCE WITH VOLUME LIMITATION**

Pursuant to Federal Rule of Appellate Procedure 32(g), Appellant, by counsel, hereby certifies that this Petitioner's Reply Brief is in compliance with relevant Type-Volume limitation in that it contains a total of 5,719 words, excluding the cover page, Table of Contents, Table of Authorities, Certificate of Compliance with Volume Limitation, Signature Block, Addendum, and Certificate of Service.